# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON
## September 4, 2024 Session

## STATE OF TENNESSEE v. ALEXANDRE KIM

**Appeal from the Criminal Court for Shelby County**
**No. 14-03857     Carolyn W. Blackett, Judge**

_____

### No. W2023-01607-CCA-R3-CD

_____

The Petitioner, Alexandre Kim, was charged with first degree murder for the October 2012 death of his mother, Estelle Kim. Following a bench trial in 2014, he was found not guilty by reason of insanity and was involuntarily committed to a mental health facility. In 2017, the Petitioner was transitioned to a Mandatory Outpatient Treatment ("MOT") program pursuant to Tennessee Code Annotated section 33-7-303. In 2021, the Petitioner sought to terminate his MOT by filing a petition in the trial court. After several hearings on the matter, the trial court denied his petition based, in large part, on the Petitioner's request to move out of state. The Petitioner now appeals from this denial arguing he meets all requirements for termination. After review, we affirm the judgment of the trial court.

**Tenn. Code Ann. § 33-7-303(d) Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Tony N. Brayton (on appeal), and William Robilio (at hearings), Memphis, Tennessee, for the appellant, Alexandre Kim.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Assistant Attorney General; Steve Mulroy, District Attorney General; and Carrie Shelton-Bush, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

The record contains the transcripts of three hearings occurring on June 8, 2021, September 13, 2022, and April 14, 2023. Expert witnesses, lay witnesses, and the Petitioner himself testified at these hearings. The record also contains pleadings with various attachments entered as exhibits, orders from the trial court, and numerous medical records, assessments, and evaluations. For clarity and to avoid repetition, we have consolidated the information from these sources in the below narrative.

### A. Underlying Offense and Preceding Events

The Petitioner testified that he had a diagnosis of schizophrenia, and his symptoms began in 2010 while he was attending the University of Tennessee at Knoxville. He became increasingly paranoid and, while periodically visiting his mother in Memphis, started experiencing "bizarre" thoughts concerning her. During one of these visits, the Petitioner attempted to reconnect with his estranged father, who had worked with the Memphis Police Department and FBI. While at his father's residence, his paternal grandmother accused the Petitioner of being an imposter, and the Petitioner's father explained that she suffered from schizophrenia. The Petitioner's father later commented that the Petitioner's mother "wasn't the same person," which confused the Petitioner and prompted him to consider that his mother might be a different person. A few days later, his father unexpectedly passed away. Upon going through some of his father's belongings after his death, the Petitioner found pictures from a case his father had worked on depicting a woman who looked "very similar" to the Petitioner's mother. This discovery caused the Petitioner to speculate that his father "had covered up [his] real mother's murder," and reinforced his belief that his mother was now an imposter.

Over the course of his visits with his mother, the Petitioner noticed certain wrinkles had disappeared from her face and thought it was strange that she resided primarily with her boyfriend. In 2012, his mother expressed her intent to move to New Orleans and to let the bank foreclose on her house in Memphis. As she had no connections in New Orleans, the Petitioner believed someone was trying to steal his mother's identity. The Petitioner attempted to speak French to his mother, as she was a French citizen, and he had been born in France and held dual citizenship. However, she responded "really strange[ly]." Additionally, she said that she remembered people whom the Petitioner had fabricated. This made it "obvious" to the Petitioner that his mother was an imposter.

On October 7, 2012, the day of the murder, the Petitioner was outside his mother's house while she was dropping off groceries. She accused him of taking her car keys. He denied this and walked into the house. She followed him and, once inside, grabbed him by the neck from behind. The Petitioner feared for his life, thinking this was an imposter who had likely been involved in his real mother's death and was armed with a gun or knife. He responded "disproportionately." He struck her with his elbow until she fell to the floor, where he proceeded to strangle her until she was no longer breathing. During the altercation, his mother did not fight back.

Afterwards, the Petitioner was focused on "self-preservation" and doing "whatever it took . . . to survive." As he believed local law enforcement was "out to get [him]" because of his father's former connection to the police department, the Petitioner thought a house fire would make it appear as if he was "not responsible for a murder." He thereafter placed his mother's body on a couch, retrieved a bottle of Everclear from his bedroom to use as an accelerant, and set her body on fire. He then walked to a nearby Subway restaurant, ordered a sandwich, and watched as fire trucks responded to his mother's home. He was arrested the next day.

### B. Adjudication and Judicial Commitment

Medical records reflected that, approximately one month after being arrested, the Petitioner was admitted to the Forensic Services Program at Middle Tennessee Mental Health Institute ("MTMHI") from November 27, 2012, to December 21, 2012, for a forensic evaluation. He was found judicially committable and not competent to stand trial. While he was not given any psychotropic medications during this time, he repeatedly requested "attention deficit hyperactivity disorder medication" and became upset when this request was denied. No behavioral issues were reported. Concerning prior mental health treatment, the Petitioner reported to MTMHI staff that his mother had previously taken him to a mental hospital for a visit that lasted two hours. After his evaluation, he was discharged back to the Shelby County jail.

The Petitioner returned to MTMHI on January 28, 2013, remaining there through June 12, 2013, and he was treated with the antipsychotic medication, Zyprexa. The Petitioner participated in treatment appropriately, but he still presented to staff as delusional and paranoid. He expressed his continued belief that his mother was an imposter and that his father conspired with law enforcement to kill his mother, and when asked, he stated that his sister could also be an imposter. He was reportedly focused on the outcome of his case if found not guilty by reason of insanity and inquired whether he would spend less time in jail or a psychiatric hospital.

As his mental state improved with medication, it was determined that the Petitioner was competent to stand trial and that he met the criteria for the insanity defense. After a December 8, 2014 bench trial, the Petitioner was adjudicated not guilty by reason of insanity for the first degree murder of his mother. Afterwards, on December 23, 2014, he was admitted to Western Mental Health Institute ("WMHI") for treatment and evaluation.

While at WMHI, the Petitioner continued to comply with his medication and treatment protocol. He neither reported nor exhibited any psychiatric symptoms and adhered to hospital rules. He was referred to as "a model patient," very intelligent, and wanting to succeed. However, according to a December 18, 2015 Forensic Services Psychological Testing Results report, the Petitioner had stated in January of that year that he was "sick of the stupid arguing so [he] took care of it," although no further context for this comment was provided. The report additionally noted that during a WMHI staff conference on December 8, 2015, the Petitioner had requested Adderall, claiming the drug "structure[d] and focus[ed]" his thoughts and gave him "superior cognitive capacity." His attending psychiatrist confronted the Petitioner regarding his repeated requests for Adderall despite multiple refusals by various attending psychiatrists to prescribe the medication. The Petitioner ultimately conceded that Adderall likely contributed significantly to his paranoia.

Additionally, reports indicated that in 2016, the Petitioner placed a call to the French Consulate in Atlanta, Georgia, to inquire whether he would be permitted to return to France in the future given his current legal status. While it was noted that his motivation for making this call had been discussed, no additional notations on this point were included in the report. He was instructed not to have further contact with the French Consulate or to make a passport application with any foreign government.

On February 2, 2017, the Petitioner was discharged to Magnolia House, a group home in Martin, Tennessee, and placed on an MOT with Generations Mental Health Center ("Generations"). Generations provided periodic reports to the trial court regarding the Petitioner's compliance with the MOT and his need for continuing treatment. In 2019, the Petitioner was transitioned to independent living with Generations with continuation of MOT services.

Generations' records from 2017 to 2022 showed the Petitioner's compliance with medication and treatment. The records noted that he successfully transitioned to independent living and that he continued neither to report nor exhibit psychiatric

symptoms. He discussed his goals and MOT with healthcare providers and presented appropriately during appointments.

On April 1, 2021, Generations' MOT Coordinator, Brandon Keller, sent a letter to the trial court noting the Petitioner's "great progress" living independently and his compliance with all conditions of the MOT. The letter provided that the Petitioner had expressed an interest in relocating to San Antonio, Texas, to be closer to the Petitioner's friend, David Nikaido, and to pursue a career in cyber security, in which the Petitioner had received certifications. As the MOT could not transfer to another state, this move would terminate the Petitioner's MOT with Generations. Mr. Keller stated each provider at Generations was aware of this potential termination and indicated that the Petitioner would likely voluntarily continue his mental health treatment upon relocation.

The letter additionally stated that the Petitioner was requesting to visit San Antonio in preparation for relocation. While in San Antonio, the Petitioner would reside with Mr. Nikaido and attempt to secure housing. On June 3, 2021, the Petitioner filed a petition in the trial court to approve his visit to San Antonio and to terminate his MOT.

### C.    MOT Termination Proceedings

On June 8, 2021, a hearing was held on the petition. In a written order, the trial court denied the Petitioner's request to visit San Antonio but reserved its decision regarding the MOT's termination. Regarding its denial of the Petitioner's trip, the trial court listed certain concerns which it maintained had not been adequately addressed at the June 8 hearing. Such concerns included the Petitioner's current mental and physical condition; a more developed mental health plan; data about individuals who had similar illnesses and offenses as the Petitioner, whose MOTs were terminated, and who moved to other jurisdictions; adequate documentation of income and living expenses for San Antonio beyond the Petitioner's self-reported budget; and the Petitioner's not having secured employment or interviews for employment in San Antonio, as employment formed the basis for his relocation request and the MOT's termination. Two subsequent hearings were conducted on September 13, 2022, and April 14, 2023. The testimony from the various hearings is summarized below.

### 1.    The Petitioner

The Petitioner testified that he had been diagnosed with schizophrenia and, while untreated, suffered from two types of delusions: (1) Capgras delusion, where he believed

- 5 -

others had been replaced by identical imposters; and (2) persecutory delusions, where he believed others were trying to harm him.

Prior to the murder and his commitment, he had never received a mental health diagnosis. He was prescribed Adderall in 2008 to improve concentration and remained on this medication until February 2012, when he decided to discontinue its use. While he was also prescribed Abilify around this time, he opted not to take it. He understood that Abilify treated depression, from which he did not believe he suffered. While he was not on any medication at the time of the murder, he believed Adderall had exacerbated his symptoms in the months prior.

Although the Petitioner initially resisted treatment and medication, he eventually agreed to take his prescribed 15 milligrams of Zyprexa twice a day. After two months, he realized he had killed his mother and began to accept his schizophrenia diagnosis. His medication and dose had not changed at the time of these hearings, and he asserted that he had remained compliant with treatment.

The Petitioner now understood that he had to remain on medication, even if the MOT was terminated. He wanted the situation to never reoccur, as his realization of the events was traumatizing. He clearly remembered the incident and, at times, suffered from nightmares about it. He felt responsible for his mother's death and experienced remorse but, with the acceptance of his mental illness, had learned to forgive himself. Since receiving treatment, he had learned to self-identify symptoms and had not experienced any delusions or paranoia. Even before treatment, he knew his thoughts were "bizarre" but "shrugged them off" because he did not understand that he was mentally ill.

He requested the MOT's termination in order to be closer to the relationship he valued most, which was with his friend in San Antonio. He and Mr. Nikaido had been best friends since middle school, and Mr. Nikaido remained one of the Petitioner's "strongest supports." He was not close with his biological family and did not plan to contact them if the MOT was terminated. Additionally, San Antonio had more employment opportunities, but if he were unable to find employment, he planned to live on Supplemental Security Income ("SSI"), as he did so at the time of the hearing. San Antonio had income-based apartments that he qualified for and would charge only thirty percent of his income. He acknowledged that, since living independently on the MOT, he had worked in a grocery store for only a few months, which he then quit to pursue cyber security training. Since then, he had obtained an "OSCP," a "penetrating testing" certification, from Offensive Security which is "pretty well known in the field"; a "PenTest +" certification which is a penetration testing certification from Camptia, the "most known . . . vendor of

certifications"; and a "CRTO" which is "a less known security certification" from Zero Point Security.  However, he further acknowledged the certificates he had earned did not require a background check, and his current resume had no explanation for the time gap between 2012 and 2022.  If he were asked to explain this time to a potential employer, he would have to be honest about the situation.  If he lost the job as a result, then "that's the reality [he had] to face."

A one-page typed summary was entered showing the Petitioner's anticipated budget for relocation to San Antonio utilizing his reported income.  The document titled "Monthly Budget" listed three income avenues as follows: "SSI +794$/mo"; "FoodStamps +234$/mo"; and "Liheap +500$/yr or 42$/mo[.]"  As expenses, the Petitioner listed the following: "Groceries: ~230$/mo"; "Rent: ~238$/mo"; "Utilities: ~included in rent"; "Internet: ~55$/mo"; "Medication Copay: ~3$/mo Levothyroxine & Olanzapine"; and "Hygiene Items: ~20$/mo[.]"  The last item listed on the Petitioner's budget was "Remaining Funds: ~ 524$[.]"

He affirmed that if the MOT were transferable to San Antonio, he would have transferred it already.  Because this was not an option, he completed a Declaration for Mental Health Treatment ("Advance Directive"), a mental health directive which he claimed was most comparable to an MOT.  The Advance Directive, which was entered as an exhibit, is a Tennessee legal document developed by the Tennessee Department of Mental Health and Substance Abuse Services based on Tennessee Code Annotated Title 33, Chapter 6, Part 10.  It provides instructions and preapproved treatments for an individual experiencing a mental health crisis who cannot make treatment decisions for himself or herself.  In the Petitioner's June 28, 2021 proposed plan to visit San Antonio, entered as an exhibit, it was noted that once he relocated, he would work with the University of Texas School of Law's Mithoff Pro Bono Program for assistance developing a new Advance Directive.

2.  Generations' Health Providers

Brandon Keller testified that he had been a therapist and MOT Coordinator with Generations for over two years.  During his work with the Petitioner, the Petitioner had made "significant progress" and had always been "extremely compliant" with treatments and medication.  The Petitioner had attended all counseling and medication management appointments, shown recognition and insight into his mental illness, and followed recommendations for treatment.  He had exhibited no signs of psychosis, delusions, or hallucinations.

Mr. Keller believed that the Petitioner would comply with treatment without a court order, as the Petitioner had expressed this intent. The Petitioner had also recognized the potential increase in "sadness" if he stopped medication. Not one to make "rash" decisions, the Petitioner had researched mental health treatment options in San Antonio and discussed his research with Generations' staff. Mr. Keller agreed that if the Petitioner were to discontinue medication, his symptoms would likely "increase" and he may experience paranoia, delusions, and hallucinations. He additionally agreed that the Petitioner should have "something stable" in San Antonio before the MOT was terminated.

Katherine Barnes, a licensed social worker and an expert in the treatment and therapy of persons with severe and persistent mental illnesses, testified that she had worked with the Petitioner in therapy for over four years. Initially, the Petitioner struggled with verbalizing his emotions, but he had eventually expressed remorse over murdering his mother and acknowledged that he did so while in an acute psychotic state. While she explained the Petitioner's onset of schizophrenic symptoms at age twenty-two and confusion regarding these symptoms was normal, she believed the Petitioner could now self-identify these symptoms.

Ms. Barnes believed that the Petitioner would continue treatment without a court order, as he was in "sustained remission" and had stated his understanding that his symptoms would return if his medication were discontinued. While living independently, the Petitioner was responsible for procuring his medication and attending all appointments. If ever late for an appointment, he always called; he also immediately reached out if his medication refill was incorrect. He had been involved and communicative about his plan to move to San Antonio and had identified potential treatment options, all of which accepted his insurance. Ms. Barnes also agreed that the job availability was much higher in San Antonio. As he had an "amazing" support system, which included Mr. Nikaido and treatment options, and ways to handle frustration and anger, Ms. Barnes believed the Petitioner was not currently a danger to himself or others.

Phyllis Taylor, a nurse practitioner with Generations, had worked with the Petitioner for two years, and the two generally communicated over the telephone. She praised the Petitioner as being "very motivated." He had complied with treatment, presented appropriately, and passed all substance screenings. She conditioned her approval regarding terminating the MOT on the Petitioner's understanding regarding his need for continued medication. As he had expressed such, she believed he would continue to comply with treatment without a court order.

She noted that approximately half of her previous clients discharged from MOTs were unsuccessful after leaving treatment. However, the Petitioner had support both in Martin and in San Antonio, which led her to believe he would do well. She had not yet spoken to the Petitioner's support system in San Antonio but intended to do so prior to his moving. While she affirmed that the Petitioner's medication could become ineffective or produce side effects at any time, she noted this was unlikely due to the Petitioner's already long-term effective use of the same medication. If discontinued, however, he could experience the resurgence of delusions and paranoia.

Barbara Montgomery, also a nurse practitioner with Generations, testified as an expert in the treatment of persons with mental illnesses. She had worked with the Petitioner for approximately eight months, with his visits conducted over the telephone. Due to his compliance with treatment, she supported the MOT's termination, as the Petitioner understood the need for him to continue to take his medication, to refill his medication regularly, and to report any side effects.

Jerry Douglas Pickard, an expert in MOT plans and client care management, testified that he had worked as the Petitioner's care manager for five years. He assisted with the Petitioner's transition to independent living and observed the Petitioner's progress with organization and self-management. During this transition, the Petitioner learned to pay his bills, manage his treatment appointments, and eventually achieve the lowest level of care available.

Mr. Pickard had recently been promoted to MOT Coordinator and now supervised the Petitioner's MOT. The Petitioner's was the first MOT he had recommended for termination. He believed the Petitioner would continue with treatment without a court order and would not lose structure after moving, as the Petitioner was aware of the consequences if he discontinued medication. The two had discussed the potential return of the Petitioner's symptoms and how to mitigate those circumstances. With proper support staff and proper medication, Mr. Pickard did not believe the Petitioner was dangerous.

Mr. Pickard was unable to guarantee that the Petitioner would not decompensate, but he noted the Petitioner had demonstrated his capability to manage his mental illness for nearly ten years. If the MOT were terminated, the Petitioner could still receive treatment such as medication management and therapy through Generations or another provider. When asked if the Petitioner would have access to Generations' staff once in San Antonio, Mr. Pickard explained, "[W]e will actually be planning to have other providers in Texas."

Lori Teague, an expert in client care management, stated she had worked with the Petitioner as a care manager for only four months and had met with him only twice. However, she described him as "exceptionally organized," with insight into his illness. She supported the termination of the MOT and believed the Petitioner would continue treatment even if not mandated. While she knew the Petitioner had killed his mother, the two had not discussed the murder in detail.

### 3. Licensed Psychologists

Doctor Jeff Feix, the Director of Forensic and Juvenile Court Services at the Tennessee Department of Mental Health and Substance Abuse Services, testified as an expert in forensic psychology and MOT plans. Dr. Feix acknowledged he was only "generally" familiar with the Petitioner's MOT, and while he did not have specific information regarding the Petitioner's day-to-day functioning and compliance, he noted that the Petitioner had done well in treatment. He expressed no reservations regarding the Petitioner's MOT termination but stated he deferred to the opinion of the agency providing the MOT on whether to renew or terminate. While only generally familiar with Advance Directives, he commented that creating one was a "great goal" for an individual contemplating termination of an MOT.

Dr. Feix testified that Tennessee generally had approximately 300 to 330 active MOTs. Each year, approximately forty to forty-five individuals had their MOTs terminated. Of these, only forty-five percent were due to the individuals being successful in treatment rather than due to death, recommitment, or provider relocation. However, he was unaware of any data showing the success or failure rate of these individuals after termination, whether they had similar charges to the Petitioner, or if any had moved out of state.

Doctor Kimberly Brown, an Associate Professor of Clinical Psychiatry and Behavioral Science at Vanderbilt University Medical Center, testified as an expert in forensic psychology. She stated she had met with the Petitioner on two occasions while preparing a risk assessment for the trial court. During these appointments, she had conducted a personality assessment inventory ("PAI") and an HCR-20 Version 3 ("HCR").

Dr. Brown explained that the HCR was one of the most commonly used and reliable violence risk assessment measures. From her interview with the Petitioner and review of his medical records, she scored the Petitioner's overall future risk of violence as "low." The Petitioner presented as a passive person and exhibited no other characteristics of violent tendencies other than being young and male at the time of the murder. The sole

reason he became violent was his mental illness, which had been treated and controlled. As such, she considered the Petitioner less dangerous than those released from prison on parole, and she commented that individuals found not guilty by reason of insanity had lower rates of violence upon release.

The PAI was a widely used and reliable psychological measure that assessed the way a person responded to the test, what symptoms the individual may be experiencing, and how the individual was functioning psychologically. While the Petitioner had responded in a way to make himself look good and relatively free of common shortcomings to which most people admitted, this did not concern Dr. Brown as it was normal in a case like the Petitioner's.

Dr. Brown acknowledged that she could not guarantee an individual would never become violent in the future; however, she explained the risk assessment community dealt with likelihoods, not possibilities. Of the "thousands" of evaluations she had conducted on individuals declared not guilty by reason of insanity for murder charges, she had seen many relapses, generally due to the inability to accept the mental illness. According to Dr. Brown, the Petitioner was not like these individuals but rather was a "textbook example" of doing "everything . . . right" after being found not guilty by reason of insanity. The Petitioner's medical records showed the Petitioner had responded "extremely well" to treatment, had been repeatedly referred to as a model patient, and had an "extremely well-managed" condition. As he had not worked while earning his certificates, he had paced himself well and avoided placing himself under too much stress.

Dr. Brown supported the Petitioner's moving to San Antonio saying it would likely increase his chance of success. To this point, Dr. Brown noted that the job market was better in San Antonio than in Martin and it was where the Petitioner's support system resided. Additionally, as most mental health appointments were conducted over tele-health, physical location was less crucial. She stated mental health treatment, not employment, was the key to the Petitioner's success. While she agreed the Petitioner should continue medication, she did not see a significant likelihood of his discontinuing medication in San Antonio, nor did she have a significant concern that the Petitioner would become a danger to himself or others. However, any onset of symptoms would be gradual and would not develop overnight or in a week.

Dr. Brown agreed that, in Tennessee, it was difficult to require a person to follow through with mental health treatment without their cooperation. However, she was impressed with the Petitioner's Advance Directive.

### 4. The Petitioner's Friends

David Nikaido, a software engineer from San Antonio, testified he and the Petitioner had been friends since they were twelve years old. In 2012, Mr. Nikaido visited with the Petitioner prior to the murder and remembered him speaking quickly, having trouble keeping eye contact, and saying the Memphis police were "targeting" him. However, Mr. Nikaido was in "complete shock" when he learned of the murder later that year. After a few years, he and the Petitioner reconnected. At first, Mr. Nikaido concealed personal information from the Petitioner, such as where he lived and information regarding Mr. Nikaido's family, but eventually the two became close friends again.

Mr. Nikaido sent the Petitioner textbooks the Petitioner had requested pertaining to chemical engineering. Initially concerned with how the Petitioner might use that information, Mr. Nikaido only sent the Petitioner books which did not contain potentially dangerous information. The Petitioner eventually became interested in cyber security, and Mr. Nikaido sent him textbooks on "ethical hacking." As the Petitioner earned several certificates in this field, the two discussed the limited job opportunities in Martin and the Petitioner's moving to San Antonio.

Mr. Nikaido had offered to let the Petitioner stay with him while the Petitioner looked for housing. Mr. Nikaido lived in a house with his partner and a roommate, both of whom were aware of the Petitioner's circumstances and had agreed to the Petitioner's visit. Mr. Nikaido did not want the Petitioner to be dependent on him. The Petitioner understood that he would be living independently and could stay with Mr. Nikaido for approximately two weeks, as that was how long Mr. Nikaido could assist the Petitioner with bills, transportation, and groceries. However, with proper planning, the Petitioner believed it would only take a week to set up independent living accommodations.

Mr. Nikaido believed the Petitioner would continue treatment without a court order and did not believe the Petitioner was dangerous. However, the two had discussed the Petitioner's possible decompensation, and Mr. Nikaido had the number for a crisis center in San Antonio for use in such an event. Mr. Nikaido stated he wanted the Petitioner to pursue therapy once in San Antonio and be under case management. Additionally, the two had agreed to have contact every two weeks and had also discussed how to proceed if their friendship ended.

Andrew Lovely testified he and the Petitioner had been friends for seventeen years. While he was "shocked" by the murder, he eventually reconnected with the Petitioner. Treatment had made a notable change in the Petitioner's behavior, and Mr. Lovely no

longer considered the Petitioner dangerous to the point that he even let the Petitioner around Mr. Lovely's wife and newborn. Mr. Lovely believed the Petitioner would continue medication without the MOT, as the Petitioner had expressed his appreciation for treatment and its positive impact on his life.

### 5. Order Denying MOT Termination

On October 11, 2023, the trial court filed a seventy-six-page order denying termination of the Petitioner's MOT pursuant to the four factors outlined in Tennessee Code Annotated section 33-7-303(g)(5). For brevity, we have consolidated the reasons relied upon for the denial.

First, as for the likelihood that harm would occur unless the Petitioner remained under court-ordered outpatient treatment, *see* Tennessee Code Annotated section 33-7-303(g)(5)(A), the trial court noted the potential risk of harm if symptoms reappeared before intervention occurred. While the trial court acknowledged the experts stated the likelihood of the Petitioner's reoffending was low, the risk was only low if the Petitioner continued his medication. As no cure for the Petitioner's illness existed, the Petitioner would always suffer from this condition, meaning his future success depended on his continuing medication. It reasoned that terminating the Petitioner's MOT based solely on the Petitioner's mere promise to continue treatment was not supported by statute when there was potential for major harm.

In light of the current mental health crisis "epidemic," the trial court expressed great frustration over the lack of data regarding individuals with terminated MOTs relapsing or remaining successful, especially those with similar charges as the Petitioner who had moved to other jurisdictions. As to Dr. Brown's testimony, the trial court noted that her opinion pertained to the Petitioner's success in a controlled environment. Noting the potential for "tragic results," the trial court expressed its fear of another violent mental psychotic break when the trial court had knowledge of the Petitioner's history and observed the need for more detailed steps for safe release of such individuals. As it feared potential liability and backlash against the State of Tennessee if the Petitioner committed a violent act after termination of his MOT, the trial court expressed the need for a legal requirement to notify other states of the Petitioner's past.

Additionally, as the conclusions and assumptions regarding the Petitioner's success were all framed within a "controlled" environment, the trial court noted this would not be the case in San Antonio. In San Antonio without employment, the Petitioner would be completely reliant on "SSI/disability" income. It questioned the Petitioner's ability to live

in San Antonio on his current budget. Additionally, the trial court distinguished the Petitioner's case from *State v. Cloar*, No. E2015-01069-CCA-R3-CO, 2016 WL 4054948 (Tenn. Crim. App. July 27, 2016), as the defendant in that case had a detailed discharge plan from involuntary commitment. As such, the uncurable nature of the Petitioner's psychosis, the vagueness and unreliability of the Petitioner's suggested living conditions in a new city, the vagueness of his treatment plan in such city, and the "major" possibility of relapse weighed against termination from his MOT.

Next, the trial court discussed the likelihood the Petitioner would voluntarily participate in outpatient treatment. *See* Tenn. Code Ann. § 33-7-303(g)(5)(B). It found that no expert could guarantee the Petitioner's continuing treatment, rather, the experts only expressed their belief that the Petitioner would do so. It also noted that any cyber security employer would require a background check, likely complicating the Petitioner's prospects of obtaining employment in that field. The trial court also expressed concern with the possibility that the Petitioner would be able to erase his own digital history to ensure his legal history remained unknown to these employers.

The trial court then addressed the Petitioner's history of compliance with outpatient treatment. *See* Tenn. Code Ann. § 33-7-303(g)(5)(C). The trial court acknowledged that the proof showed the Petitioner had been extremely compliant, but it also noted instances with Adderall and Abilify where the Petitioner made his own medical decisions and did not listen to medical advice, which may have contributed to his mother's murder. The trial court expressed great concern regarding future decompensation and the possibility of the Petitioner's convincing himself in the future that he no longer suffered a mental illness. It again noted that the Petitioner's success, as agreed on by the experts, depended on the Petitioner's continuing medication.

Lastly, the trial court addressed the fourth consideration concerning any other factor the court deemed necessary to evaluate a person's need for court-ordered outpatient treatment. *See* Tenn. Code Ann. § 33-7-303(g)(5)(D). It opined that mental illness should be treated differently in criminal law because the point of concern was not only the criminal conduct but a defendant's state of mind. Because certain severe mental illnesses, such as the Petitioner's, were not curable, they required the continued use of medication. The trial court determined that the Petitioner's MOT ensured the Petitioner's and the general public's safety. Accordingly, the MOT would remain in place until the legislature established policies with other jurisdictions addressing the potential discontinuation of medication and relapse of individuals like the Petitioner.

This timely appeal followed.

## II.    ANALYSIS

On appeal, the Petitioner argues that the trial court erred by denying his petition to terminate his MOT.  Specifically, he argues that he meets all requirements for termination and that the trial court based its denial on misstatements of fact and subjective fear that he would relapse and pose a harm to others.  The State counters that the trial court reasonably found the statutory factors weighed against termination.

At the outset of our analysis, we note that the Petitioner argued his termination request pursuant to Tennessee Code Annotated section 33-7-303(g).  The trial court likewise analyzed and decided the case based upon this subsection.  Subsection (g), enacted by the General Assembly on July 1, 2017, created a new procedure for defendants found not guilty by reason of insanity after having been charged with first degree murder or a Class A felony codified in title 39, chapter 13.  *See* Tenn. Code Ann. § 33-7-303(g)(1); 2017 Tenn. Pub. Acts, ch. 342, §§ 1, 3.  This procedure included a four-factor analysis for trial courts to conduct when determining whether a defendant should be discharged from an MOT, the analysis utilized by the trial court in this case.  Prior to the enactment of subsection (g), *all* felony defendants charged with a crime against a person in title 39, chapter 13, regardless of felony classification, were subject to the more general provisions of Code section -303, specifically subsections (a)(2), (b), and (c).

The Petitioner was transitioned to his MOT in February 2017, prior to the enactment of subsection (g) in section 33-7-303 in July 2017.  *See* Tenn. Pub. Acts, ch. 342, §§ 1, 3.  As such, it is arguable that the Petitioner's petition for termination should be governed by the prior statutory scheme.  We note that some assessments and evaluations from WMHI list the Petitioner's legal status as "T.C.A. § 33-7-303(c)" and "303c" while he was judicially committed.  However, the record is not well developed regarding the subsequent procedures used during his transition to outpatient treatment.

The record provides that the trial court's August 6, 2021 order denying the Petitioner's visit to San Antonio mentioned the decision to continue termination procedures under subsections (b) or (g) of Code section -303 would be made at a future date.  The trial court's October 11, 2023 order denying termination of the MOT references Tennessee Code Annotated sections 33-6-621 and -706 but conducts its analysis only under Code section 33-7-303(g).  Additionally, while the Petitioner referenced subsection (b) in both his original petition and in his present appellate brief, he has consistently argued for termination under subsection (g) and has not raised for our consideration the issue of which subsection governs his termination petition.  The record is silent as to this matter in all other regards.  We are mindful that a party knows what is best for his or her case, is

responsible for advancing the facts and arguments essential to relief, and it is not the role of the appellate courts to research or construct a litigant's case or arguments for him or her. *See State v. Bristol*, 654 S.W.3d 917, 923-24 (Tenn. 2022). As such, we will proceed to consider the merits of the arguments under section 33-7-303(g) as they have been presented and argued by the parties.

Tennessee Code Annotated section 33-7-303(g) pertains to persons charged with first degree murder and found not guilty by reason of insanity at the time of the commission of the offense. Following an insanity acquittal, outpatient evaluation is conducted to determine whether an individual meets the criteria for judicial commitment. Tenn. Code Ann. § 33-7-303(g)(1). If such criteria are met, the individual remains committed until discharged by court order to outpatient treatment. *Id.* § -303(g)(2). If the individual is not committed, or is later released from judicial commitment, then the individual must participate in outpatient treatment for an initial mandatory period of six months. *Id.* § -303(g)(3)-(5). If the individual still requires court-ordered treatment after the six-month period, the trial court may order such treatment continued and proceed to review the individual's need on an annual basis. *Id.* § -303(g)(5). When determining the appropriateness for continued court-ordered outpatient treatment, the trial court considers the following factors:

> (A) The likelihood that harm will occur unless the person remains under court-ordered outpatient treatment;
>
> (B) The likelihood that the person will voluntarily participate in outpatient treatment;
>
> (C) The person's history of compliance with outpatient treatment plans; and
>
> (D) Any other factor that the trial court deems appropriate for purposes of evaluating the person's need for court-ordered outpatient treatment.

*Id.*

Tennessee Code Annotated section 33-7-303 provides that either party may appeal to this court a final adjudication under this section and vests this court with jurisdiction to hear such appeals. *See* Tenn. Code Ann. § 33-7-303(d). We review the trial court's denial of the Petitioner's request to terminate his MOT under an abuse of discretion. While previous panels of this court have utilized a de novo standard, we note that those cases involved discharge from judicial commitment pursuant to the Department of Mental Health

- 16 -

and Substance Abuse Services procedures outlined in title 33 chapter 6 of the Code section and were decided prior to the enactment of subsection (g). *See, e.g., State v. Groves*, 735 S.W.2d 843, 844 (Tenn. Crim. App. 1987); *State v. Tripp*, 754 S.W.2d 92, 94 (Tenn. Crim. App. 1988). Furthermore, subsection (g) provides that the trial court "may order continuation" of an MOT beyond the initial six-month period after consideration of the listed factors. Tenn. Code Ann. § 33-7-303(g)(5). The General Assembly's use of "may" is permissive and indicates the trial court has considerable discretion when making this decision. *Cf. State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (holding, in part, that the legislature's 2005 amendments broadened the trial court's discretion in sentencing decisions and supported adopting an abuse of discretion review).

Since the enactment of Code section 33-7-303(g) in 2017, our courts have yet to address the application of the statute in the context of a petition to terminate an MOT. *Cf. State v. Yancey*, No. W2022-00131-CCA-R3-CD, 2022 WL 6257321, at *1, *4-6 (Tenn. Crim. App. Oct. 10, 2022) (discussing Code section -303(g) in the context of a trial court's sua sponte modification of an MOT). However, there is case law addressing involuntary judicial commitments and release therefrom, as well as MOT placement, which involves analysis of similar considerations as the factors reflected in subsection (g), albeit with adherence to different governing procedures. While not controlling, we utilize these cases to help guide our analysis.

To avoid repetition in our analysis for Code sections (g)(5)(A), (B), and (D), we first address the Petitioner's history of compliance. *See* Tenn. Code Ann. § 33-7-303(g)(5)(C). The Petitioner contends that the trial court erroneously considered his refusal to take non-antipsychotic medication prior to his schizophrenia diagnosis and that the relevant evidence overwhelmingly shows he has been "100%" complaint with treatment for over a decade.

The Petitioner took Adderall from approximately 2008 to 2012, then discontinued its use several months before the murder. While this occurred prior to psychiatric treatment, the record reflects instances of the Petitioner repeatedly requesting this medication at both MTMHI and WMHI. During his initial competency evaluation, reports noted that the Petitioner continually requested attention deficit hyperactivity disorder medication and became upset when these requests were denied. A 2015 report additionally reflects that the Petitioner repeatedly requested Adderall at WMHI to the point that he was confronted by his psychiatrist about these requests. During this confrontation, the Petitioner eventually acknowledged that Adderall likely contributed to his paranoia, and he ultimately agreed that taking it was not beneficial to his condition. However, the Petitioner's continued requests for Adderall to gain a feeling of "superior cognitive

- 17 -

capacity," despite the refusal of multiple practitioners to prescribe it and his understanding that he could potentially become dangerous by taking it, demonstrates a continuous pattern of seeking medication against medical advice. As such, we cannot conclude that the trial court erred by considering the Petitioner's history with medication in this regard.

Additionally, records from 2012 reflect the Petitioner's reporting previously being at a mental health hospital for two hours when his mother was alive. While this statement was not further addressed in subsequent reports or hearings, such statements raise more questions and concern over the Petitioner's history and past compliance with mental health treatment. Moreover, while judicially committed at WMHI in 2016, the Petitioner contacted the French Consulate to inquire whether he could return to France given his current legal status. This call was made while the Petitioner was on medication and reportedly doing well in treatment. This call caused the Petitioner to be confronted again by WMHI staff. He was instructed not to contact the French Consulate in the future or to make a passport application with any foreign government. Such behaviors cast doubt on the Petitioner's claim that he has been "100%" compliant in treatment. These behaviors also contradict the WMHI reports and descriptions of the Petitioner's being a "model patient."

We next turn to the remaining three factors. *See* Tenn. Code Ann. § 33-7-303(g)(5)(A), (B), and (D). The Petitioner contends that nothing in the record indicates he is a danger to himself or others and that his risk of future violence is low. He further argues that evidence shows he will likely continue treatment voluntarily upon the MOT's termination.

In its order denying termination of the Petitioner's MOT, the trial court maintained its concern regarding the vagueness and unreliability of the Petitioner's termination plan to relocate to San Antonio. It noted that the Petitioner's success in treatment had been in Martin and that his termination plan not only removed him from this "controlled" environment but placed him in an unpredictable living situation with a vague mental health treatment plan. It further noted that the Petitioner had no job in San Antonio and would potentially be dependent on SSI income indefinitely, which the Petitioner had not shown he could successfully live on once in San Antonio. Additionally, the trial court distinguished the present case from *Cloar* by noting that the *Cloar* defendant, unlike the Petitioner, had a detailed discharge plan from involuntary commitment. *See Cloar*, 2016 WL 4054948, at *15.

In *Cloar*, this court reversed the trial court's denial of the defendant's discharge from involuntary commitment, which had spanned over twenty years, to a ninety-day

furlough in a group home and then to voluntary aftercare through Veterans' Affairs. *See Cloar*, 2016 WL 4054948, at *1, *4. The *Cloar* court reasoned that the "problem" with the trial court's denial was that it was based on a lack of safeguards in the discharge plan when the legislature had not required such safeguards or post-discharge supervision so long as the defendant was likely to voluntarily participate in treatment. *Id.* at *16 (citation omitted). It noted that an expert witness had described the defendant's discharge plan as "comprehensive" and "very reasonable," saying the plan included established medical and mental health care and transportation with the Department of Veteran's Affairs, a sponsor and scheduled meetings for Alcoholics Anonymous, access to a rehabilitation center offering job and skills training and counseling, and housing in a group home for at least ninety days with the opportunity to stay longer. *Id.* at *15-16.

We note that *Cloar* was decided in July 2016. In July 2017, the legislature amended how an insanity acquittee charged with first degree murder discharges from involuntary commitment and from an MOT and, importantly, included a catch-all factor for the trial court's consideration, seemingly expanding the trial court's discretion in such matters. *See* Tenn. Code Ann. § 33-7-303(g)(5)(D). While we agree that termination of an MOT, by its nature, does not anticipate court-ordered supervision, we conclude that a defendant's proposed plan upon termination is appropriate for consideration under the new statutory scheme. As such, we review under this fourth factor the trial court's findings that the Petitioner's termination plan contained considerable shortcomings and how these shortcomings affect the other future-minded statutory factors: the likelihood of harm and the Petitioner's likelihood to voluntarily continue treatment in the event of the MOT's termination. *See id.* § -303(g)(5)(A), (B), and (D).

The trial court found that the Petitioner's suggested living situation in San Antonio weighed against termination. To this point, several expert witnesses testified to the importance of stability and support for the Petitioner's success in future voluntary treatment. Mr. Keller agreed that the Petitioner needed something "stable" in San Antonio prior to moving, and Mr. Pickard conditioned his belief that the Petitioner was not dangerous on the Petitioner's having proper support staff and proper medication. However, while both Ms. Taylor and Ms. Barnes believed the Petitioner had a good support network in San Antonio, Ms. Taylor acknowledged not having had contact with any persons in this support system.

As presented, the Petitioner's plan is to live independently within a few weeks of moving to San Antonio on SSI income without a plan for permanent employment or housing. Once in San Antonio, the Petitioner plans to reside with Mr. Nikaido, Mr. Nikaido's partner, and Mr. Nikaido's roommate. While Mr. Nikaido affirmed both

individuals' awareness and consent to the situation, nothing was presented to the court which verified this consent or that provided their identities and backgrounds. Additionally, Mr. Nikaido indicated that he did not want the Petitioner to be dependent on him and gave permission for the Petitioner to reside with him for approximately two weeks. While the Petitioner considered Mr. Nikaido his strongest support and wanted his MOT terminated in order to be closer to Mr. Nikaido, the two agreed to have contact every two weeks once the Petitioner was living independently. Such limited communication and assistance create a highly stressful timeline and run contrary to the "amazing" support system awaiting the Petitioner in San Antonio testified to by the experts.

Additionally, while the Petitioner testified regarding San Antonio's subsidized housing, he submitted no documentation showing the availability, requirements, waitlist times, or rental rates for such housing. Furthermore, other than the Petitioner's rudimentary self-reported budget, no evidence showed the Petitioner's current income and living expenses, nor was any cost comparison between Martin, Tennessee, and San Antonio, Texas, addressed, which had been a noted concern for the trial court throughout the proceedings.

As to the Petitioner's employment prospects in San Antonio, which formed the primary basis for his termination petition and relocation request, the trial court found that the Petitioner's legal past would likely negatively impact his job search. We agree that it is difficult to envision a situation where the Petitioner's past, or at least his lack of employment for over a decade, would not be a subject discussed with a future employer, especially in the security field. The Petitioner has not held a job in over a decade other than a short-term grocery store position, which he quit to pursue cyber security training. While Dr. Brown noted with approval that the Petitioner had paced himself well by not getting a job while earning his certificates so as not to put himself under too much stress, employment generally comes with stress. The Petitioner has not shown he can handle such demands while successfully continuing treatment. He now wants to move to a new city largely based on working in the cyber security field, a profession in which he has no employment experience and no bona fide employment prospects. The uncertainty inherent in this situation is not conducive to establishing the stable environment the Petitioner requires, as encouraged by the expert witnesses. However, we disagree that the evidence provided at the hearing demonstrated that the Petitioner's cyber security certifications gave him the ability to erase his own digital history so it would remain unknown to employers, such being merely conjecture on the part of the trial court.

Lastly, in its denial, the trial court relied upon the vagueness of the Petitioner's mental health treatment plan once in San Antonio. While the expert witnesses testified to

their belief that the Petitioner was not a danger to himself or others, such belief was premised upon the Petitioner's continuing treatment. To this point, Dr. Brown opined that mental health treatment was the key to the Petitioner's success. While she assessed that the Petitioner's future risk for violence was low, she affirmed that his symptoms could return if he stopped treatment. Mr. Keller stated that, without medication, the Petitioner's symptoms would likely increase. Ms. Barnes and Mr. Pickard stated their discussions with the Petitioner showed that the Petitioner understood his symptoms could return if medication was discontinued. While noting that approximately half of her previous clients discharged from MOTs were unsuccessful after leaving treatment, Ms. Taylor conditioned her approval of termination on the Petitioner's understanding that he required medication.

Despite this consensus, the Petitioner failed to present a detailed mental health treatment plan to the trial court. While he noted that he had contacted providers in San Antonio which accepted his insurance, no definite information, like staff qualifications or services provided, was submitted. Moreover, the Petitioner's reliance on Mr. Nikaido for mental health support is problematic. Dr. Brown opined that if the Petitioner decompensated the process would be gradual. While Mr. Nikaido had witnessed the Petitioner's symptoms back in 2012 prior to the murder, this visit occurred during the height of the Petitioner's symptomatic state. Although Mr. Nikaido testified that he would contact a crisis center if the Petitioner decompensated, no evidence was presented the Mr. Nikaido would be able to recognize a gradual onset of decompensation, especially if the two were in contact only every two weeks.

Additionally, the Petitioner argues that his history of treatment compliance while living independently and the completion of his Advance Directive demonstrates his ability to manage his condition and his intent to continue treatment voluntarily. However, while Dr. Feix and Dr. Brown supported the completion of an Advance Directive, such document would have no legal effect in San Antonio. Additionally, while the Petitioner has managed his treatment while under the MOT, the experts stated his symptoms could recur without medication or potentially even while still taking medication, regardless of his ability to manage his treatment. *See State v. Baumgartner*, No. W2003-00038-CCA-R3CD, 2003 WL 21383208, at *7 (Tenn. Crim. App. Apr. 14, 2003) (holding the relevant inquiry for decompensation is not merely a defendant's ability to manage medication but that decompensation is likely to occur absent treatment). Despite this, the Petitioner presented only general options for his continued treatment upon relocation, a Tennessee mental health document that would have no legal effect in Texas, and the support of Mr. Nikaido, who may not initially recognize the onset of schizophrenic symptoms, and who was unlikely to be present to offer the Petitioner actual support during a decompensation period.

As Tennessee has provided mentally ill defendants the right to an insanity defense, it has "the prerogative to impose conditions on those who successfully rely upon such a defense." *State v. Phillips*, 968 S.W.2d 874, 881 (Tenn. Crim. App. 1996). Accordingly, release from such mental health supervision involves a treatment side, in which the Petitioner has achieved success, but it also involves a practical side. Stated another way, "Good patients may be bad risks." *State v. Krol*, 344 A.2d 289, 303 (N.J. 1975). All of the Petitioner's success has been in the Martin environment with established care, routines, housing, and expenses. This would not be the case in San Antonio. *See Tripp*, 754 S.W.2d at 94-95 (expressing concern over the "gap of considerable dimensions" in the proposed discharge plan to an MOT, considering the security and safety of the community with such gaps, and acknowledging expert's speculation that external pressures may effect defendant's mental state upon release to an MOT); *Cloar*, 2016 WL 4054948, at *15 (noting with approval the "comprehensive" proposed discharge plan); *State v. Mallady*, No. M2010-02142-CCA-R3-CD, 2012 WL 76901, at *7 (Tenn. Crim. App. Jan. 10, 2012) (reasoning, in part, that the defendant's MOT plan contained cautionary measures to protect the defendant and society from danger); *State v. Floyd*, No. W2000-02236-CCA-R3-CD, 2001 WL 846046, at *5 (Tenn. Crim. App. July 20, 2001) (addressing concerns regarding the defendant's living arrangements upon release to an MOT plan).

The Petitioner's untreated schizophrenia caused him to beat and strangle his mother to death, burn her body in a house fire, and then order a sandwich and watch as emergency personnel responded. As such, we recognize the dangerousness in terminating his MOT based on a job not yet acquired, in a city containing one social contact, and with no established mental health care or housing. *See Krol*, 344 A.2d at 303 ("The conditions under which the patient will live after [conditional] release should certainly be conducive to his recovery, or at the very least, not aggravate his condition. His family life and friends, the area in which he lives and work that he could obtain, if it would be helpful, are all relevant."). Therefore, based on the vague nature of the proposed discharge plan and the unstable environment it would foster, we conclude the trial court did not abuse its discretion in finding that termination of the MOT under such conditions creates a likelihood that harm will occur. *See* Tenn. Code Ann. § 33-7-303(g)(5)(A), (D). Likewise, we agree that the likelihood of participation in voluntarily treatment decreases with such shortcomings, as such instability is not conducive to successful treatment. *See id.* § -303(g)(5)(B), (D). As such, the trial court did not abuse its discretion in this regard.

However, we agree with the Petitioner that the trial court placed undue emphasis in its denial on the lack of data regarding an insanity acquittee's discharge from an MOT and leaving the jurisdiction. Both Dr. Feix and Dr. Brown testified that statistics analyzing the outcomes of similarly situated MOT terminations did not exist. While such data would be

theoretically helpful, each case must be decided on its own facts and merits. *See State v. Travis*, 622 S.W.2d 529, 532 (Tenn. 1981) (stating such in context of criminal sentencing); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) (citations omitted) (discussing that federal sentencing principles consider each convicted person individual and each case unique); *Krol*, 344 A.2d at 299 (explaining that for an insanity acquittee, "each individual's fate must be adjudged on the facts of his own case").

Additionally, we recognize the trial court's public safety concern of a released insanity acquittee's later committing an act of violence and the potential backlash against the state of Tennessee for discharging such an acquittee. However, the current statutory scheme reflects the considered judgment of our legislature in balancing the need for public protection from a defendant with the unjustified detention of that defendant. *See Floyd*, 2001 WL 846046, at *5; *Mallady*, 2012 WL 76901, at *8. As such, we rely on its judgment for such considerations. Accordingly, we cannot conclude that the lack of more comprehensive legislation or the lack of data regarding similar mental health circumstances should be held against the Petitioner to the extent that it confines him beyond what is legally permitted. Nevertheless, when viewing the facts in the record and the trial court's analysis in toto, we conclude the trial court did not abuse its discretion by denying the petition to terminate the MOT.

## III. CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE

- 23 -